**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ABRIAL GOEN,** | ) | |
| | ) | **Docket No: 3:23-cv-00218** |
| **Plaintiff,** | ) | |
| | ) | **Judge Richardson** |
| **vs.** | ) | |
| | ) | **Magistrate Judge Newbern** |
| **KEITH T. DELK, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

"*Plaintiff seems to argue that she is entitled to dividends, or else some alternative proceeds, simply because Mr. Delk continues to see proceeds from Insequence himself.*"

– Defs'. Memo. of Law in Supp. of M.S.J. ("Defs' Brief"), at 10.

Plaintiff could not have said it better herself. After Anthony Westbrook's death, as Keith Delk continued to take $68,000 per month in *de facto* dividends from Insequence, Plaintiff expected that she, too, would receive a proportionate share of dividends on account of the stock she inherited from her father. Plaintiff's expectation was reasonable, for at least three reasons. First, Insequence had a long, unbroken history of paying its shareholders *de facto* dividends on a monthly basis in proportion to each shareholder's percentage ownership. Second, Insequence expressly promised Westbrook it would keep paying profits to his estate for as long as it continued to hold stock, and Delk backed up those promises in multiple emails and text messages to Westbrook shortly before he died. And third, caselaw involving shareholder oppression in close corporations establishes that it is objectively reasonable for a minority shareholder to

receive a return on her shares in proportion to that received by the majority shareholder, regardless of the label the majority shareholder attaches to his compensation.

Yes, Plaintiff was entitled to receive dividends simply because Delk, the newly-minted majority shareholder of Insequence, was continuing to receive them. And yes, Delk breached his fiduciary duties and caused Insequence to break its contractual promises by freezing out Plaintiff. Defendants' summary judgment motion should be denied, while Plaintiff's should be granted.

## LEGAL STANDARD

In seeking summary judgment, the Defendants must demonstrate that the Plaintiff has not made a showing sufficient to establish the existence of an essential element of her claims. *Pineda v. Hamilton County, Ohio*, 977 F.3d 483, 491 (6th Cir. 2020). This standard is met only if the record, taken as a whole, could not lead a rational trier of fact to find for the plaintiff. *Id*. In order to find for the plaintiff, there must be enough evidence to allow a reasonable juror to conclude that the plaintiff's position more likely than not is true. *Id*.

## ARGUMENT

### I. **Delk breached his fiduciary duty to Plaintiff by continuing to take *de facto* dividends from Insequence after Westbrook's death while freezing out Plaintiff.**

#### *A. The "salary" and "loan prepayments" Delk received from Insequence between August 2022 and March 2023 were* de facto *dividends.*

Delk alleges he is entitled to summary judgment because he became the majority shareholder of Insequence in July 2022 after Insequence repurchased 2/3 of Westbrook's shares and as such, he had the sole discretion to cease Insequence's long-running practice of distributing its profits as salary and dividends, and instead, distribute those profits exclusively as salary to himself. *See* Defs' Brief, at 8-10. According to Delk, *if* he, and he alone, had decided to declare a "dividend" on Insequence's stock after Westbrook's death, *then* Plaintiff would have

shared in the "dividend." Defs' SUMF, ¶ 8. But he, and he alone, decided to cease distributing profits in the form of "dividends," so according to Delk, Plaintiff has no cause of action. Defs' Brief, at 8; *see also* Delk Depo., Doc. No. 20-2, at 36-38, 42, 73.

How does Delk account for the fact that *he* received over $400,000 from Insequence in the seven months between Westbrook's death and the buyback of Plaintiff's shares? He says he and Westbrook decided to start calling all of their monthly draws a "salary" in June 2022, just before the first partial buyout, and Westbrook of course could not continue receiving a "salary" after his death because he ceased being an employee. *See* Defs'. Stmt. of Undis. Mat. Facts. ("Defs' SUMF"), ¶¶ 6-7. Delk accounts for the rest of the money he pulled from Insequence as "prepayments" of the money he loaned to Insequence to enable it to complete the first partial buyout. Pltf's Stmt. of Undis. Mat. Facts ("Pltf's SUMF"), ¶¶ 69-72. According to Delk, because he never labeled any of his distributions as "dividends," he was not required to allow Plaintiff to participate in the distributions.

Delk's argument is too clever by half. A dividend is merely any distribution of corporate profit to shareholders, and close corporations often characterize their dividends as something else, such as salary, for tax purposes. Douglas K. Moll, *Shareholder Oppression and Dividend Policy in the Close Corporation*, 60 Wash. & Lee L. Rev. 841, 876-77 (2003). So regardless of whether or not Delk formally declared a "dividend" as controlling shareholder, the monthly payments he continued to draw from Insequence every month after Westbrook's death were *de facto* dividends.

*B. Delk violated Plaintiff's reasonable expectations by refusing to pay her dividends in proportion to his* de facto *dividends.*

Delk argues that it was not "objectively reasonable" for Plaintiff to expect to receive dividends on her shares of Insequence, even though Delk was continuing to receive *de facto*

dividends on his. Defs' Brief, at 8. According to Delk, dividends are a privilege, not a right, and if he as majority shareholder chose not to declare a formal dividend, Plaintiff is without recourse. *Id*. Delk is incorrect. In fact, multiple courts have held that a majority shareholder continuing to take *de facto* dividends while denying them to the minority shareholder engages in textbook shareholder oppression and violates the minority shareholder's reasonable expectations.

Even if the acts of the controlling shareholder fall within the literal scope of powers granted to them by law or contract, a court should grant relief to a minority shareholder where her reasonable expectations have been thwarted. *Meiselman v. Meiselman*, 307 S.E.2d 551, 563 (N.C. 1983), *citing* F. O'Neal*, Oppression of Minority Shareholders § 9.04,* at 886 (1975). In determining what constitutes the reasonable expectations of a minority shareholder of a close corporation, a court should consider any written agreements, as well as "the words, conduct, and history of the parties." *Lund, Trustee v. Lund*, 924 N.W.2d 274, 280 (Minn. Ct. App. 2019). "One of a shareholder's fundamental expectations is to share in the corporation's profits." *Four Seasons Equip., Inc. v. White (In re White)*, 429 B.R. 201, 214 (Bankr. S.D. Tex. 2010). Paying disguised dividends to employee-shareholders, while denying dividends to a non-employee minority shareholder, upsets the minority shareholder's reasonable expectations. *Id*.; *see also Real Carriage Door Co., Inc. ex rel. Rees v. Rees*, 486 P.3d 955, 961 (Wash. Ct. App. 2021) (converting shareholders' dividends into a "dramatically increased salary" for the employee-majority shareholder violates the minority shareholder's reasonable expectations).

*In re Kemp & Beatley, Inc.*, 473 N.E.2d 1173 (N.Y. Ct. App. 1984) illustrates the point. Kemp & Beatley was owned by eight shareholders, two of whom were longtime employees. *Id.* at 1176. The company had a long-standing policy of distributing *de facto* dividends in the form of "extra compensation bonuses" to all eight shareholders, based on their percentage ownership.

*Id.* at 1180. Shortly after one of the two employee-shareholders resigned and the other was fired, Kemp & Beatley changed its policy of declaring *de facto* dividends based on stock ownership to one of paying extra compensation for services rendered to the company, thus excluding the former-employee shareholders from participating. *Id.* New York's highest court held that in doing so, Kemp & Beatley engaged in oppressive conduct which defeated the reasonable expectations of the minority former-employee shareholders. *Id.*

What Delk did is no different. He offers no reasonable explanation for *why* Insequence stopped paying dividends on account of Plaintiff's stock, while continuing to pay him *de facto* dividends at the rate of $68,000 per month. He simply says it was within his discretion to do so, and Plaintiff had no reason to expect he would do otherwise. Defs' Brief, at 8-10. As *White, Rees,* and *Kemp & Beatley* illustrate, this is wrong as a matter of law. It was eminently reasonable for Plaintiff to expect that Delk would pay her a proportionate share of the *de facto* dividends he was receiving, particularly because Delk made certain to pay Westbrook a proportionate *de facto* dividend on his shares of Insequence up to the very day Westbrook died. *See* Delk Depo., Doc. No. 20-2, at 41:11 – 41:20 ("Q. So in August [2022], you get $60,000 on a W-2 basis. And then Mr. Westbrook gets $10,020, right? **A. Uh-huh.** Q. What was the reason for the change there? **A. He died on August 15th.** Q. So – **A. So we owed him or we were due to pay him half a month's pay.**"). Delk thwarted Plaintiff's reasonable expectations by freezing her out from her rightful share of Insequence's profits.

## II. <u>Delk acted with "malice, avarice or self-interest."</u>

Delk alleges that Plaintiff cannot prevail on her breach of fiduciary duty and oppressive conduct claims because she has not come forward with sufficient proof that Delk acted with "malice, avarice or self-interest." Defs'. Brief, at 6-7. Apparently, Delk's position is that in

order for Plaintiff to prove those claims, she must establish that the Defendants were motivated to deny her distributions out of animosity or spite. But that is not the correct standard. "Legal malice" in this context does not mean ill will towards the injured party, but rather the defendant's committing a harmful act without good cause, privilege or justification. *Crouch v. Kroger Co.*, 2009 WL 10664332, at *5 (W.D. Tenn. 2009). "A plaintiff can prove legal malice based on a defendant's words and conduct in the context of the surrounding circumstances." *Id.* The key determination for the court is, considering the standpoint of both the plaintiff and the defendant, whether or not the defendant acted reasonably in the due exercise of his own rights. *Id.*

When the correct standard is applied, it is obvious that Delk acted maliciously in completely freezing out Plaintiff from distributions. For years prior to Westbrook's death, Delk and Westbrook received their monthly compensation from Insequence in two ways: 1) a relatively large monthly partnership distribution and 2) a relatively small bi-monthly salary. Pltf's SUMF, ¶¶ 15-22, 26, 29, 32, 35, 38, 41. Until the first portion of the Insequence stock buyout in July 2022, Delk and Westbrook's distributions were always equal, because Delk and Westbrook owned an equal amount of the company's shares. Pltf's SUMF, ¶¶ 2, 17, 26, 29, 32, 35, 38, 41. After the first partial buyout and before Westbrook's death, the monthly distributions remained proportionate; Delk owned 75% of the outstanding shares, so he received 75% of the distributions; Westbrook owned the remaining 25%, so he received 25% of the distributions. Pltf's SUMF, ¶¶ 38, 41. Critically, Delk promised Westbrook it would remain that way, not as long as Westbrook remained alive, but as long as Westbrook *or his heirs* continued to own Insequence stock. In emails and text messages, Delk wrote "I just sent you an addendum to the stock sale contract….And it specifies that you get the pro rata shares of profits (16.7%) until the

second part [of the buyout] occurs"; "[a]s you still own 16%[1] of Insequence your estate will periodically be receiving money"; "[n]ot selling the last bit of stock could be good for your kids" because "the profits they share would continue for years. If they somehow blew the money you will give them, at least they would still have that additional income." Pltf's SUMF, ¶¶ 59-61.

As soon as Westbrook died and Delk believed he had *carte blanche* control over Insequence, he simply pretended these commitments he made to Westbrook did not exist and eliminated all distributions to Westbrook's heirs. Pltf's SUMF, ¶¶ 80, 87. He did not eliminate or reduce his own distributions, however; not only did he continue taking his standard $61,000 per month distributions, but he also began taking an additional $7,000 per month in the form of "prepayments"[2] of the loan he made to Insequence to allow it to finance the first part of Westbrook's buyout. Pltf's SUMF, ¶ 66-72, 81, 88. This is a textbook example of shareholder oppression. *See* Douglas K. Moll, *Shareholder Oppression in Close Corporations: The Unanswered Question of Perspective*, 53 Vand. L. Rev. 749, 758 (2000) ("[T]he close corporation investor typically looks to salary rather than dividends for a share of the business returns because the '(e)arnings of a close corporation often are distributed in major part in salaries, bonuses and retirement benefits.' When actual dividends are not paid, therefore, a minority shareholder who is [not an employee or director] is effectively denied any return on his investment as well as any input into the management of the business.") Delk was so determined to prevent Plaintiff from receiving any return for her shares that he declined to declare a year-end profits distribution from Insequence in December 2022, even though he and Westbrook each had

---

[1] At that point, Westbrook owned 167 shares and Delk owned 500 (Insequence repurchased Westbrook's other 333 shares). Pltf's SUMF, ¶ 68. So Westbrook owned 25% of the issued and outstanding shares (167/667), not 16%.

[2] Delk did not use any of this money to actually prepay the loan at any time before Insequence bought back the rest of Plaintiff's shares. Pltf's SUMF, ¶¶ 73-74.

received year-end distributions of $200,000 in 2020 and $450,000 in 2021, and Insequence had over $1.7 million in the bank at the end of 2022. Pltf's SUMF, ¶¶ 29, 32, 35, 38, 84, 86. The importance of this fact cannot be overstated. Insequence had plenty of cash available to pay Plaintiff her *pro rata* share of dividends (just over $75,000), plus a reasonable year-end profits distribution in line with the 2020 and 2021 distributions. But Delk thought he could get away without paying either one, so he did not.

The Defendants' Motion for Summary Judgment does not address, much less refute, any of these facts. Delk merely contends that none of these facts are relevant because, according to him, Plaintiff conceded in her deposition that he was not acting maliciously or intentionally. *See* Defs' SUMF, ¶¶ 30-31. The only support Delk cites for his position is a line of questioning in which Delk's counsel, without laying any foundation or defining the legal terminology used, asked Plaintiff several questions (over counsel's objections) that called for Plaintiff to draw legal conclusions or apply the law to the facts. *See* A. Goen Depo., Doc. 26-1, at 57:20 – 59:5. From this testimony alone, Delk asks the Court to draw the unwarranted inference that Plaintiff will be unable to prove malice or intentional misconduct at trial. In his desperation to do so, Delk inaccurately summarizes Plaintiff's testimony. As to malice, Plaintiff did not testify that she could not "provide[] any facts tending to prove" that Delk acted with malice. *See* Defs' SUMF, ¶ 30. She said that, while she is unfamiliar with how "malice" is defined, Delk broke an agreement he made with Westbrook. A. Goen Depo., at 58:7-10. Nor did Plaintiff testify that she was unable to prove that Delk's misconduct was intentional. *See* Defs' SUMF, ¶ 31. She said that her proof was identified in her Rule 26 initial disclosures. A. Goen Depo, 58:19-59:14. Plaintiff simply did not make the admissions Delk claims she did.

Delk's argument not only gets Plaintiff's testimony wrong, but also ignores the

substantial uncontroverted evidence that Delk froze out Plaintiff for no good reason. Plaintiff has identified abundant specific facts that show that Delk intentionally and wrongfully deprived Plaintiff of a return on her shares, while taking more than $400,000 for himself over just seven months. The proof that Delk acted with malice, avarice and self-interest is abundant. Delk's inaccurate and misleading citation of Plaintiff's deposition testimony cannot alter that reality. Delk's motion for summary judgment on Plaintiff's breach of fiduciary duty and shareholder oppression claims should be denied.

## III. Insequence breached the Common Stock Repurchase Agreement and Addendum.

Defendants argue that Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and procurement of breach of contract must be dismissed because Insequence did not breach the Common Stock Repurchase Agreement or Addendum.[3] Defendants' argument fails, because Insequence breached the clear language of the contracts when it withheld distributions on account of Plaintiff's shares of stock after Westbrook's death.

Under Tennessee law, the cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. *CapWealth Advisors, LLC v. Twin City Fire Ins. Co.*, 665 F.Supp.3d 862, 871 (M.D. Tenn. 2023). In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent and give reasonable meaning to all of the provisions of the agreement. *Id*. When a contract is fully integrated and unambiguous, its terms cannot be varied, contradicted or supplemented by parol evidence; nonetheless, a court may consider extrinsic evidence of the facts and circumstances surrounding

[3] In making this claim, Defendants again misconstrue the record. They allege (without citing to the summary judgment record) that "Under the [Common Stock Repurchase] Agreement, the parties agreed that Westbrook would take a salary from Insequence for the remainder of his life," implying that Westbrook agreed his heirs would not receive any payments as stockholders after

the contract's execution to aid in interpreting the contractual terms. *Zurich American Ins. Co. of Ill. v. Lipscomb & Pitts Ins., LLC*, 2021 WL 1419465, at *8 (W.D. Tenn. 2021), *citing Indiv. Health Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 697-98 (Tenn. 2019).

Defendants argue that because the Repurchase Agreement and Addendum do not say the exact words "Insequence will pay dividends to Plaintiff", Insequence did not breach the contracts by paying *de facto* dividends to Delk but not Plaintiff. Defendants' position is untenable and inconsistent with the plain language of the contracts. Section 3a. of the Addendum, in fact, does use the word dividends: "Stockholder [Westbrook] compensation or dividends will be paid through direct payroll deposit or in such as [sic] manner as the company is directed by either the Stockholder or his estate representative." Addendum, Doc. No. 20-7, § 3a. But according to Defendants, this contractual commitment to pay dividends to Westbrook "or his estate representative" does not mean what it clearly says – instead, it means only that <u>if</u> Insequence declared a dividend, Plaintiff would get her share. Defs' Brief, at 10. Defendants' interpretation is unreasonable. Section 3a. cannot be read in isolation; rather, it must be read in harmony with the rest of the contract. *Thornton v. Dutch Naturals Processing, LLC*, 629 F.Supp.3d 777, 790 (M.D. Tenn. 2022). And the provision immediately preceding Section 3a. reads: "In the event Stockholder becomes deceased prior to completion of the second transaction all profits and/or salary due to the Stockholder shall be paid to the Stockholder's estate or other entity as directed by a court of jurisdiction." Addendum, Doc. No. 20-7, § 3. These two provisions, in turn, must be read in conjunction with the last sentence of Section 4 of the Addendum: "The Stockholder <u>or his estate</u> will continue to retain ownership of the remaining shares of stock <u>and shall be entitled</u>

---

his death. *See* Defs' Brief, at 10. The Common Stock Repurchase Agreement simply does not

to the rights and profits of a Stockholder."[4] Addendum, Doc. No. 20-7, § 4 (emphasis supplied).

There is only one way to construe these three provisions of the Addendum harmoniously. Insequence and Westbrook agreed that if Westbrook did not sell his remaining 167 shares before he died, his estate would continue to be paid profits from Insequence at the same rate and the same times as Delk, no matter if those profits were described as compensation, dividends, profits, salary or something else. The text messages and emails Delk sent Westbrook in connection with the Addendum only serve to reinforce that this is the correct interpretation of the contract. In three separate communications, 10 days apart and only a month before Westbrook's death, Delk reassured Westbrook that under the Addendum, Westbrook's estate would continue receiving profit distributions from Insequence even after his passing. *See* Section II, *supra*, *citing* Pltf's SUMF, ¶¶ 59-61.

Delk attempts to gin up a factual dispute where one does not exist by claiming that he and Westbrook had a "June 2022" agreement that Westbrook would stop receiving a salary when he no longer was an employee. *See* Defs' SUMF, ¶¶ 6-7. It is not clear whether or not this reference to a "June 2022" agreement is a reference to the Addendum (which was dated June 23, 2022 but signed later). If it refers to the Addendum, Delk simply is incorrect. The Addendum, in fact, it says the opposite: Westbrook or his estate will continue receiving "profits and/or salary", "compensation" or "dividends" for as long as he or the estate remains a stockholder. Addendum, Doc. No. 20-7, ¶¶ 3., 3a., 3c. If, instead, the "June 2022" agreement refers to something other than the Addendum, there is no such alleged agreement in the record, and in any case, Delk is attempting to contradict the plain terms of the Addendum by testifying about a prior

say this. *See* Doc. No. 20-3.

[4] Delk drafted the Addendum, Delk Depo., at 65:5 – 66:13, and his signature as President of Insequence appears immediately below these words.

or contemporaneous agreement outside the written contract – which is prohibited by the parol evidence rule. *Indiv. Healthcare Specialists, Inc.*, 566 S.W.3d at 695-96. The language Delk used in drafting the Addendum is susceptible to only one reasonable meaning. Insequence promised to continue paying *de facto* dividends on Westbrook's shares until the moment it repurchased all of them.

Insequence broke that promise. It paid Plaintiff <u>nothing</u> in the seven months between Westbrook's death and the second buyout, while paying Delk more than $400,000 in *de facto* dividends. Pltf's SUMF, ¶¶ 80-81, 87-88. And the only person who could have induced Insequence to breach the Addendum and the implied covenant of good faith and fair dealing was Delk, its President and controlling shareholder. Here, too, the Court should deny the Defendant's motion for summary judgment.

## CONCLUSION

The Defendants are not entitled to summary judgment. The proof does flow in one direction, but not in the direction that favors the Defendants. Instead, the undisputed facts show that Insequence completely cut off all dividends to Plaintiff while continuing to pay substantial dividends to Delk, with no valid business justification. The Court should grant summary judgment to Plaintiff, and deny it to Defendants.

Dated this 16th day of February, 2024.

**DICKINSON WRIGHT PLLC**

By:_/s/ Stephen M. Montgomery__________
Stephen M. Montgomery, #026489
Fifth Third Center, Suite 800
424 Church Street
Nashville, Tennessee 37219-2395
(615) 244-6538

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2024, a true and correct copy of the foregoing instrument was served on all parties registered to receive electronic notice in this case through the Court's CM/ECF system, including the following:

W. Carl Spining
The Ortale Kelley Firm
330 Commerce Street, Suite 110
Nashville, TN 37201
cspining@ortalekelley.com

_/s/ Stephen M. Montgomery____________